Filed 9/3/15  In re C.H. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re C.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SABRINA H.,<br><br>        Defendant and Appellant. | A141655, A141984 & A143907<br><br>(Alameda County Super. Ct. Nos. SJ13022115, 13022173 & 13022174) |
| SABRINA H.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>        Respondent;<br><br>ALAMEDA COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | |

1

In these consolidated dependency proceedings, Sabrina H. (mother) contests the jurisdictional findings and dispositional orders made with respect to her two youngest sons—S.H. (born May 2012) and C.H. (born May 2013). Specifically, she argues that the jurisdictional findings, insofar as they related to her conduct, were facially insufficient and should be stricken from the petition. She further claims that she received both statutorily and constitutionally defective notice of the detention and jurisdiction hearings in these matters and that the juvenile court' s dispositional orders were not supported by substantial evidence. And—with respect to all three of her sons—she asserts that she was provided ineffective assistance of counsel.[1]

In addition, mother challenges by writ petition the juvenile court's December 15, 2014, decision to terminate her reunification services with respect to S.H. and C.H. and to refer the two boys for a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[2] In particular, mother maintains that the juvenile court erred in refusing to grant a continuance of the December 2014 hearing at which her reunification services were terminated so that she could testify. She further argues that the reunification services provided to her were not reasonable. Having carefully reviewed the record in all of these matters, we see no error requiring reversal of any of the challenged findings and orders. We thus affirm the juvenile court's jurisdictional

---

[1] Mother's oldest son, C.C. (born November 2005), was initially part of the same dependency action as S.H. and C.H. However, on February 7, 2014, the juvenile court bifurcated C.C.'s case from that of the other two minors. C.C. was subsequently placed out of state with his previously noncustodial father, Anthony C., and, on May 22, 2014, C.C.'s dependency case was dismissed with full legal and physical custody of the minor granted to his father. Mother's timely appeal from this termination and custody order is part of these consolidated proceedings. In contrast, by order dated January 6, 2015, we denied mother's motion to construe her notice of appeal from the dispositional orders of S.H. and C.H. to include C.C., as the notice of appeal was not timely with respect to the oldest minor. Thus, the jurisdictional findings and dispositional orders made in C.C.'s dependency action are not at issue in this appeal.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified. All rule references are to the California Rules of Court. On our own motion, we consolidated these matters for decision on May 12, 2015.

findings and dispositional orders with respect to S.H. and C.H., affirm the juvenile court's order terminating C.C.'s dependency action, and deny mother's writ petition.

## I.  BACKGROUND

### A.  *Establishment of Dependency Proceedings*

On June 17, 2013, the San Joaquin County Human Services Agency (San Joaquin) filed a dependency petition with respect to the three minors who are the subject of these proceedings, alleging that the boys were at risk of harm due to filthy and hazardous conditions in the family home, mother's ongoing mental health issues, her past drug use, and the sexual abuse of C.C. by Joshua C., the alleged father of S.H. and C.H. Specifically, in May 2013—after mother called 911 stating that she was going into labor with C.H.—the Stockton Police Department responded to mother's home and discovered numerous unsafe conditions, including: boxes stacked up all around the front room; broken and dirty couches; the smell of rotting food, garbage, and fecal matter; kitchen counters full of old, moldy food; cockroaches and other bugs in the oven; garbage and soiled diapers on the kitchen floor; and bottles of pesticide and a knife lying within reach of the minors.  Mother had videos of various traps and poison plugs placed around her home and "thousands of cockroaches scattering on the wall."  C.C. reported that cockroaches crawled in his ears and, according to mother, the cockroaches were "in 'everything,' " crawled all over her food, and fell from the ceiling on them.  She admitted that her adjoining neighbor had a similar problem, but was able to maintain it better.  In March 2013, 10-month-old S.H. had been seen at a clinic for scabies and a staph infection.

Additionally, the petition alleged that mother suffers from schizophrenia and depression and had past issues with medication compliance and possible drug abuse.  For instance, in 2005, she tested positive for cocaine and heroin during prenatal visits while she was pregnant with the oldest minor, C.C.  During this timeframe, her prenatal care was sporadic and she had stopped taking her psychotropic medication.  Mother was also reported to be noncompliant with her psychotropic medication at the birth of S.H. in 2012.  Moreover, she tested positive for opiates both at S.H.'s birth and at an emergency

3

room visit two weeks earlier. Mother's explanation was that she " 'thought a friend gave her a Vicodin.' "

Finally, the petition included allegations that Joshua C. was currently under investigation by the Stockton Police Department for the sexual abuse of C.C. In particular, Joshua, who had been living in the family home, was accused of an incident during which he reportedly forced C.C. to the floor, closed the door, pulled down the boy's pants, pushed his penis into the minor's buttocks, and grabbed the minor's penis. When C.C. tried to flee, Joshua held the boy by his throat and warned him not to tell anyone. Joshua no longer lived with the family, but was instead living in San Francisco with his parents.

The social worker initially made contact with mother while she was in the hospital with newborn C.H. Mother admitted that her home was dirty, but minimized the situation and indicated that she was planning on moving. Mother also confirmed her diagnosis of schizophrenia and depression, indicating that she took medication to treat these issues. She further stated that, due to the sexual abuse of C.C. by Joshua, the family was in " 'witness protection' " and that she had gotten a restraining order against Joshua, who she described as having mental health issues. Mother additionally reported that she home schooled 7-year-old C.C. because she did not " 'trust public schools' " and liked to be with him at all times. Later, however, she stated that she was looking into summer school because she did not want C.C. home all summer. Mother reported that her two older children were with her sister, but she did not know her sister's address and could not reach her by telephone. The social worker agreed to follow up with her during the next week and see the home.

Thereafter, mother reported a new address (Gateway Court), but multiple attempts to contact her by phone, at her old address (Kelley Drive), at Gateway Court and through her Victim Witness worker proved unsuccessful. On May 30, 2013, the social worker made another unsuccessful attempt to contact mother at Kelley Drive. At that time, she noted a blanket hanging from the front window, stacks of plastic bags of clothing visible from the window, and a barking dog inside. After she left a business card asking mother

4

to call, she received a voicemail from mother approximately 15 minutes later claiming that she had not been home when the social worker came by.  Later that day, both mother's Victim Witness worker and her sister confirmed that mother still resided at the Kelley Drive address.  Apparently, the Gateway Court address that mother had reported belonged to her sister.  However, when the social worker requested a welfare check that evening at the Kelley Drive residence, the officer reported that there was still no answer.  The next day another home contact was attempted, but, again, no one answered the door.

The social worker left mother a message on June 4, 2013, stating that a home visit was urgent and that if mother did not call back that day the social worker would refer the matter to determine if further action was warranted.  Mother did leave a message on June 4, complaining that she was being " 'wrongfully evicted,' " that nobody was helping her, and that she did not have time to meet with the social worker.  The social worker responded with a message stating that she needed to see the children and that she could not help mother if mother would not answer her door.  The social worker finally spoke to mother later that same day.  Mother again claimed that she was being wrongfully evicted and stated that she had to have everything out of her home by June 6.  She further indicated that she was staying with relatives and that she could not meet with the social worker until June 6.  She would not disclose the address of these relatives, however, and, throughout the conversation, talked about " 'here' " in a way that seemed to indicate that she was actually at the Kelley Drive residence.  The social worker explained to mother that, if she did not answer her door on June 6, the matter would be staffed for further intervention.

On June 5, 2013, mother left a message for the social worker stating that she needed to reschedule the June 6 meeting because she had found a place to live and was moving.  She also stated that she was tired and needed "another week."  When the social worker went to the Kelley Drive address the next day, no one answered the door, but there were still bags of clothing in the front window and some belongings outside of the residence.  The social worker left a card asking mother to call.  Later that day, she also left mother a voicemail explaining that mother needed to provide her new address if she

was moving. On June 8, 2013, mother left a voicemail for the social worker stating that she still had not moved, did not know when she would move, and did not know when she could meet with the social worker. Thereafter, on June 11, 2013, the social worker learned that mother had not taken newborn C.H. to the doctor since their release from the hospital. Rather, she had failed to attend the May 20 appointment that had been scheduled for her, and had not called to reschedule.

Thus, on June 11, 2013, the social worker left a message for mother, informing her that the matter was being referred to the juvenile court and that she would be called with the date, time, and location of the detention hearing. Mother did not respond. In its report filed in connection with the petition, San Joaquin chronicled mother's unresponsiveness and lack of cooperation and asked the juvenile court to detain the minors from mother's care.

A detention hearing was first scheduled for June 17, 2013, the same date on which the petition and related report were filed. At that hearing, the social worker indicated that she had left two voicemails on mother's cell phone, with no response. A copy of the petition was also left at the front door of mother's Kelley Drive residence shortly after 2:00 pm on June 17. The matter was continued to June 20, 2013, so that further efforts at notifying mother could be made. At the June 20 hearing, the social worker reported that mother had received telephone notice of the June 17 hearing, stating: "I left a voicemail for her Thursday, Friday[,] and she did call me back Friday at 7:30 in the evening, and so *she did get the notice*. But court was Monday and I hadn't retrieved that voicemail yet. I didn't have proof she got the voicemail." (Italics added.) In addition, with respect to notice for the continued hearing, counsel for San Joaquin reported: "We then sent additional notice, actually sent a text message to the mother for today's hearing. Mother responded to that, questioning why she needed to be at the hearing. There were messages back and forth. She was told you must be at the hearing. We can arrange transportation for you . . . ." On this basis, the juvenile court concluded that notice had been given to mother as required by law. It then proceeded with the hearing in her absence, ordering the children detained and the appropriate warrants issued so that the minors could be

6

taken into protective custody once they were found.  The matters were continued to July 2, 2013, for jurisdiction.

On July 2, mother again failed to appear and the children had not been located. Counsel for San Joaquin indicated that an absent parent search had been conducted which revealed that mother's last known address was still the Kelley Drive residence.  Thus, the social worker had served a copy of the petition by leaving it on the door at Kelley Drive. The trial judge expressed doubt as to this method of service, stating:  "You know, I'm not sure if leaving this petition on the front doorstep is valid service."  It therefore continued the matters to July 23, 2013, so that further attempts at service could be made.  On July 8, 2013, the social worker mailed a notice of hearing to mother for the July 23 date to both the Kelley Drive residence and to Joshua C.'s San Francisco address, as she suspected that the couple might have gotten back together.  The notices were sent by first class mail.

Although mother again failed to appear for the July 23, 2013 hearing, Joshua C. was present.  The court confirmed his status as the alleged father of S.H. and C.H. and ordered paternity testing.  When asked about mother's whereabouts, Joshua C. responded:  "I heard she's, um, you know, like in San Francisco, maybe in the Hayes Street or downtown."  According to Joshua, he had not actually seen or heard from mother since he was served with the restraining order.  Thereafter, based on the mailed notice to mother, the juvenile court proceeded in her absence, finding the allegations in the petition true.  A dispositional hearing was scheduled for August 2013 and then continued to November 21, 2013, as the whereabouts of the minors remained unknown.

**B.**   *Transfer and Dispositional Matters*

Subsequently, while disposition in these matters was pending, mother and her three children were located at a shelter in San Francisco and the minors were detained on October 29, 2013.  At her first juvenile court appearance on November 4, 2013, an attorney was appointed for mother and she indicated that she was currently living in Alameda County.  After continuing the matter to verify mother's address, the juvenile

court transferred the proceedings to Alameda County on November 13, 2013, so that disposition could be completed in mother's county of residence.

On January 6, 2014, the Alameda County juvenile court accepted the cases on transfer from San Joaquin County. Mother appeared at this hearing with retained counsel, Stephen Chong, and contested the recommended dispositional orders. Thus, the matters were continued to February 7, 2014, for a contested hearing. In the meantime, the court ordered mother to complete a psychological evaluation and submit to weekly random drug testing. Supervised visitation was authorized for mother a minimum of once per week.

In its report filed in connection with the January 6 hearing, the Alameda County Social Services Agency (Agency) recommended that reunification services be provided to mother with respect to S.H. and C.H., but that C.C. be placed with his father and dependency dismissed with an appropriate custody order. Mother was reported to be cooperative and communicative, but denied she was to blame for the state of her Kelley Drive residence. Exhibiting some symptoms of paranoia, she claimed that her previous landlord and Joshua C. had " 'set her up' " so that her children would be removed. Indeed, even after being evicted, she felt the previous landlord was following her and working with Joshua. Mother also denied that she had absconded with the children when she ceased contact with San Joaquin, claiming that she was just trying to keep her children safe from Joshua.[3]

According to mother, she had been treated for mental health issues since she was a young adult, but had never been psychiatrically hospitalized. By her report, she was taking Seroquel for schizophrenia and bipolar disorder and was taking " 'a lot of it' " lately due to the situation with her children. Her pill bottle, however, indicated that it had last been refilled in early November and, as of December 23, 2013, she still had two pills remaining. The Agency made referrals for mother to appropriate mental health services.

---

[3] It bears repeating at this point, however, that Joshua was actually living in San Francisco when mother relocated there with the children.

C.C.'s father, Anthony C., confirmed that mother had been previously diagnosed with schizophrenia, bipolar disorder, and depression. He stated that he could not maintain his relationship with mother due to her psychological issues. According to Anthony C., when they lived together, mother would often carry on full conversations with herself and was "very paranoid." Indeed, Anthony C. reported that mother kept C.C. out of school after she was told that she could not stay and monitor him throughout the day in kindergarten. Anthony C. also stated that, when he and mother were dating in San Francisco, she smoked crack cocaine and would prostitute herself to obtain the drug. Finally, Anthony C. reported that he tried to maintain his relationship with C.C. through visits and phone calls, but that mother would try to impede their relationship. When he did go to the family home to visit C.C., he observed the house to be " 'filthy' " and cluttered with boxes and debris.

When they were removed from their mother, the minors had been placed together in foster care. The Agency reported that S.H. suffered from emotional disturbances, such as regularly head butting the wall and hitting, pinching, or kicking others. He had displayed similar behaviors while with his mother, and had a large scar on his forehead due to the persistent head butting. When he was frustrated and angry, S.H. was not consolable and would scream "very loudly" for long periods of time. In addition, an IEP was being sought for C.C. because he had not attended formal schooling since kindergarten and could not read or write.

After the foster parents disclosed being overwhelmed caring for both S.H. and the infant C.H. and requested that the minors be removed, the three children were placed together with their maternal great-aunt and her husband on January 24, 2014. As mother resided in the same apartment complex, she was able to have daily supervised contact with the minors. In the Agency's opinion, however, the children would not be safe if returned to their mother due to her history of absconding with them in San Joaquin County and her denial about the reasons for their removal. In addition, mother's untreated mental health issues impacted her judgment and decision making. Finally, the Agency believed that mother's history of cocaine abuse required further assessment.

While disposition was pending, mother set up initial appointments for individual therapy, psychiatry services, and drug testing. Her first drug test on January 8, 2014, was too diluted to be tested. Tests on January 18 and 21 were negative. The extent of mother's medication compliance, however, remained unclear. After making initial contact with Pathways to Wellness (Pathways), the clinic recommended by the Agency for psychiatric services, mother failed to follow through and then chose to set up an initial appointment with an alternate clinic. Moreover, she had received emergency medication from a third clinic in December 2013, and also indicated she would be following up with that provider. When asked by the social worker in January 2014 to bring her medications in for review, she failed to do so. Because mother had been without consistent psychiatric care for some time, the Agency opined that "it appears highly important that she establish herself with ongoing psychiatry services for continuity of care."

Mother also completed her psychiatric evaluation, which confirmed that she was dealing with "current significant emotional difficulties." At the time of the evaluation, mother indicated that she was hearing the voices of her children and had a history of hearing voices since she was a teenager. Moreover, testing revealed that mother was presently experiencing a severe level of depression. In addition, the evaluator concluded that mother "displays severe impairment in her ability to form accurate impressions of herself and others where she misinterprets the actions and intentions of others and perceives events in a distorted manner causing difficulty anticipating the consequences of her actions, faulty judgment, and undermining her adjustment. Her confusion separating reality and fantasy will lead to previse adjustment difficulties and make the demands of everyday living difficult without assistance, and the degree of her impairment may meet the criteria for a psychotic disturbance." The doctor recommended individual therapy, parenting classes, and abstinence from illegal substances. Importantly, she also stressed the need for compliance with an appropriate course of psychotropic medication.

On February 7, 2014, the Agency requested that C.C.'s dependency action be bifurcated from the dependencies of S.H. and C.H., and the juvenile court granted this request. Thus, on February 18, 2014, the juvenile court conducted a dispositional hearing

10

with respect to C.C. only at which—over the objection of mother— the minor was declared to be a juvenile court dependent, removed from mother's custody, and placed in the home of his previously noncustodial father under a plan of family maintenance.[4] In separate proceedings on February 18, the juvenile court found Joshua C. to be the presumed father of both S.H. and C.H. and authorized supervised visitation between Joshua and the two minors. On March 12, 2014, disposition with respect to S.H. and C.H. was again continued.

A contested dispositional hearing was finally held on April 7, 2014, with respect to S.H. and C.H. In connection with that hearing, the Agency filed an addendum report to update the court regarding the parents' current reunification efforts. Specifically, with respect to mother, on February 19, 2014, she finally attended her first appointment at Pathways for monthly medication evaluation and monitoring. However, despite being reminded by the social worker, mother arrived so late for her March 19, 2014, Pathways appointment that she could not be seen. She informed the doctor that she would no longer be using Pathways because her primary care physician would be monitoring her medication. In addition, mother stopped seeing Dr. Goodlow for individual therapy in mid-February 2014, claiming that she had not been able to reach the therapist and that, when she arrived for a scheduled appointment, he was not there. Dr. Goodlow, in contrast, indicated that it was mother who failed to attend the appointment. On February 27, the social worker reminded mother of Dr. Goodlow's contact information (mother said that she had lost it) and asked her to resume therapy.

In February and March 2014, according to the addendum report, mother had five negative drug tests, one no show, one test positive for alcohol, and two tests positive for prescribed back pain medication. Finally, visitation with the minors continued in the home of the caregivers with no reported concerns. In fact, since being placed with the maternal great-aunt, S.H.'s negative behaviors had reportedly improved, although he was still "a lot to manage."

---

[4] As previously stated, a notice of appeal was not timely filed with respect to these dispositional orders.

11

At the contested hearing on April 7, a letter was admitted from Dr. Goodlow which indicated that mother was currently engaged in therapy, but had attended only two sessions in February and March 2014. In addition, mother testified regarding her medication compliance, stating that she had a current prescription for Seroquel from her primary care physician and took the medication as prescribed. On cross-examination, however, mother explained why she had 25 milligram tablets for a prescription of 200 milligrams per day as follows: "I don't take Seroquel during the day. *If I take it*, I take 200 milligrams at night, *if I need it*, 200 milligrams. I take the smaller pills because I have children. And *if it's too much* or too sedating and—you know, *I don't take 200 milligrams*." (Italics added.) Mother also indicated that in the past (most recently in late 2013 during the pendency of these proceedings) she has tried to wean herself off the drug, but would not do so again unless instructed to.

Both Agency counsel and counsel for the minors argued that mother's failure to stabilize her medications and participate regularly in therapy placed the minors at substantial risk of harm. Mother's attorney, in contrast, argued vigorously that nothing in mother's current situation represented an actual risk of harm to the children such that removal of the minors from her custody was warranted. He asked either for voluntary supervision pursuant to section 360, subdivision (b), family maintenance services, or permission for mother to reside with the current caregivers and have unmonitored contact with the children. In the end, the juvenile court took the matter under advisement so that it could further consider relevant evidence and case law.

On April 14, 2014, the court entered dispositional orders for S.H. and C.H. Specifically, the court declared the two boys to be juvenile court dependents, removed them from their parents' care, and ordered reunification services for both mother and Joshua C. In finding that the minors would be at substantial risk of harm if left in the care of their mother, the court indicated that it was "very concerned" with the results of mother's psychological evaluation as described above. The court noted that the evaluating doctor recommended that mother continue her psychotropic medications and therapy and that the evidence in the case showed that mother was inconsistent in both

areas.  The court concluded as follows:  "It is the Court's opinion that the mother is not stable at this time, that the mental condition that allowed her home to be in the condition that it was in which caused the Court in San Joaquin County to take jurisdiction of this case still exists."   Mother filed a timely notice of appeal with respect to the juvenile court's April 14, 2014, dispositional orders for C.H. and S.H.

**C.      *Reunification Efforts***

In an interim review report filed in July 2014, the Agency related that mother was generally engaged in the reunification services ordered by the juvenile court, with varying levels of success.  As previously stated, she had completed her psychological evaluation.  She had also begun a parenting class and reported that she was attending weekly therapy, although the social worker had been unable to verify her attendance with the therapist, Dr. Goodlow, despite numerous attempts.  In addition, while mother failed to attend five out of eight drug tests, the tests that she did take revealed no non-prescription medications.

Mother, however, had been inconsistent in attending regular sessions with the doctor at Pathways.  After informing the doctor on March 24 that she would no longer be using Pathways because her primary care physician was monitoring her medication, she contacted the Pathways doctor on May 30, 2014, stating that she needed a medication refill.  She then missed scheduled appointments on June 11, 18 and 24, before finally being seen on June 27, 2014.  Noting that mother's engagement with Pathways had been minimal, the Agency stressed that it was "vital" for mother "to engage with this valuable service."

In the meantime, the minors were doing well in the home of their maternal great-aunt.  In fact, according to the social worker, the minors were "clearly connected" to their caretaker and she was doing a "great job" providing for them.  Since mother lived in the same apartment complex as the maternal great aunt, she was having supervised visitation with C.H. and S.H. every morning and evening, with no concerns reported.

At the interim review hearing on July 16, 2014, the juvenile court continued the case for a six-month review.  In addition—after a hearing in chambers—the court granted

13

the motion of mother's attorney, Stephen Chong, to withdraw as her attorney of record. A new attorney was appointed for mother.

Unfortunately, by the time of the six-month review in October 2014, mother's situation had substantially deteriorated. Indeed, on the day after the interim review hearing in July, the police were called out to the apartment complex where the minors resided after a physical altercation between mother and the maternal great-uncle (Mr. L.). Reportedly, mother spanked C.H. after he climbed out of his crib and then told Mr. L. that she had done nothing to cause the minor's crying. Mr. L. became angry at mother for lying, at which point mother confessed that she had spanked C.H. Mother then reportedly came after Mr. L. while he was holding C.H., and he had to block her punches to shield the minor. Eventually, he grabbed mother's hair to hold her away from him and the baby.

Subsequently, the maternal great-aunt reported the spanking incident to the social worker. She also indicated that she was concerned about mother's mental health as " 'she appeared to be acting crazy.' " In particular, the maternal great-aunt disclosed that mother had told her that if she " 'had a gun she would kill the kids and this whole situation would go away.' " As a result, the social worker planned to move mother's supervised visitation to a neutral setting. However, this change did not immediately occur. Instead, the maternal great-aunt reported numerous issues with mother during visits as they continued in the caregiver's home. Specifically, according to the maternal great-aunt, mother would not change diapers during visits, would go outside to use her cell phone and fail to monitor the minors, would watch TV rather than attending to the minors, and would put the children in the crib rather than playing with them.

The social worker met with mother in August 2014 and spoke with her at length regarding what she needed to do to reunify with her children. Mother at first became defensive, stating that she didn't have any mental health issues and was capable of caring for the minors. Ultimately, however, she agreed that she did have some mental health concerns. The social worker pointed out what a great opportunity mother had living only

14

25 yards from the minors and suggested that mother try to work with the maternal great-aunt on ways to become more involved in her children's lives.

On September 8, 2014, at 2:30 am, however, the police were again called to the home of the maternal great-aunt, looking for mother. Several relatives reported that mother was locked in a cousin's bathroom next door and had called the police from there. After this second incident with the police, the maternal great-aunt asked that the minors be moved because she felt overwhelmed by mother's behaviors.

A meeting was set for September 11 to discuss the placement of the children. Although mother was given notice of this meeting and indicated that she would attend, she did not appear. Instead, she left the social worker 11 different messages that day on a range of topics. And, during the actual meeting, the maternal great-aunt received numerous messages and texts from mother begging her to leave the meeting as it did not concern her. A decision was made to immediately take the minors back into custody. Later that day—after mother learned that the minors had been removed from the home of the maternal great-aunt—she reportedly threatened to kill the social worker. The family called the police because of mother's out-of-control behaviors, and mother was subsequently placed on an involuntary psychiatric hold pursuant to section 5150.[5] The minors were placed with their paternal grandmother the next day. As a result of this incident, mother was asked to leave the residence she had been sharing with a relative, and she was told that—should she return to the property—the police would be contacted. In addition, both the aunt and the social worker expressed interest in filing restraining orders against mother.

---

[5] This statute provides, in relevant part, that "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

With respect to her reunification obligations during this time period, mother continued to report seeing her therapist on a weekly basis. Unfortunately, the social worker had still not been able to confirm this, after leaving more than six messages for Dr. Goodlow asking for a progress letter. In addition, mother completed her parenting class obligation. Mother also submitted to drug testing five times since the completion of the interim review report, with three no shows. On August 4, 2014, she tested positive for methamphetamine. According to mother, she did not know how she could have tested positive for this drug, but reported that she went to a bar with friends and "could have 'popped something.' " However, mother again tested positive for methamphetamine on September 11 after her detention pursuant to section 5150.

Most importantly, mother continued to be inconsistent with her appointments at Pathways for medication evaluation and monitoring. She failed to appear for several appointments and was routinely three or four hours late for the appointments that she did attend, such that it was " 'just by luck of the draw' " that the doctor had been able to see her. Moreover, Pathways reported that it was only prescribing two medications for mother, substitutes for Zoloft and Seroquel. However, mother told the social worker on several occasions that her medications had changed, and she had prescriptions for a number of other drugs, including methadone and buspirone. Additionally, according to mother, after she had an allergic reaction to the buspirone, she took a "red pill" and a "white pill" given to her by a cousin. The white pill was Xanax, but she did not know what the red pill was. Noting that mother was not maintaining her proper medication and had ingested non-prescribed medications as well as illegal substances, the social worker expressed serious concern for mother's mental stability. Indeed, after her detention pursuant to section 5150 on September 11, mother went to Pathways, appearing disoriented, disheveled, and under the influence. When she was told about a new treatment plan and diagnosis, she appeared angry, refused to sign the plan, and walked out of the office.

In its six-month review report, the Agency requested that mother's reunification services be continued for 60 days. It emphasized that mother needed to attend all of her

scheduled medication appointments and follow the recommendations of her service providers. It also recommended that mother enroll in a dual diagnosis program to stabilize her mental health concerns and address any substance abuse issues. If mother could not substantially engage in her case plan in the additional time granted, the Agency would then recommend termination of reunification and referral of the minors for a permanency planning hearing. For her part, mother wanted her children returned. She reported to the social worker that she had an order from a judge granting custody of all three minors to her and would leave messages for the social worker wondering why C.C. had not been returned to her care. She did not share the social worker's concerns regarding her mental health, but indicated that she was in significant physical pain from a slipped disk and would need surgery.

At the six-month hearing on October 1, 2014, the matter was continued to deal with restraining order issues and because the Agency's recommendation was contested, apparently by counsel for the minors. The minute order for November 6, 2014, states that both restraining orders against mother were granted through November 6, 2017. It also notes continuance of an issue regarding mother's use of a "comfort dog" in court. Thereafter, at a hearing on November 19, 2014, the court issued an order expressly prohibiting mother from bringing her comfort dog to court, "unless she could provide the court with acceptable written proof that the dog is a service dog, not just a comfort dog." Any such proof was required to be submitted prior to the next hearing. In addition, at the November 19 hearing, the Agency indicated that it intended to submit a new report to the court, recommending termination of mother's reunification services. Given this change, minors' counsel withdrew his request for a contested hearing, but the hearing date was maintained so that mother and Joshua C. could contest the Agency's new recommendation.

On November 21, 2014, the Agency filed an addendum report recommending termination of reunification services and the setting of a permanency planning hearing pursuant to section 366.26 for S.H. and C.H. The boys remained in the home of their paternal grandmother. The social worker detailed the many referrals being made to

17

support the minors in their new placement in another county, including attempts to set up therapeutic visitation with mother. In addition, the social worker provided a copy of the progress report on mother's individual therapy that had finally been received from Dr. Goodlow on September 29, 2014. According to Dr. Goodlow, mother had been working hard to meet her treatment goals. However, while she had made "marked progress," she continued "to need treatment and a lot of work on understanding how her behaviors and decisions have adversely impacted her children's safety and physical health." Dr. Goodlow further noted that mother had missed her September 12, 2014, appointment (the day after her detention under section 5150) and he had not been able to reach her to reschedule.

At the start of the 6-month-review hearing on December 15, 2014, mother was present outside of the courtroom with her support dog. She did not have documentation that the dog was a service dog, rather than just an emotional support animal, despite the fact that the court had previously made clear that such evidence would be required to admit the dog to the courthouse. According to mother, she previously had a service dog identification card, which she showed to court security when she first came to the courthouse for the case, but she had since lost it. She believed that she had been allowed to bring the dog inside for previous hearings because security had seen the identification at some point. The court questioned mother's version of events, indicating that it did not recall the dog being present until the last few hearings, when it had become an issue. Citing concerns about the length of the full-day trial and the lack of evidence that mother's dog had any specific training to deal with physical or psychological disabilities, the juvenile court judge gave mother the choice of leaving the dog outside or declining to participate in the hearing. Mother chose to leave the courthouse with her dog.

Thereafter, mother's attorney called the social worker to testify regarding the services provided to mother in the case. Although mother had not visited with the minors since they were placed with their paternal grandmother on September 12, 2014, the social worker described his efforts to establish supervised or therapeutic visits for her. He reported two attempts to set up supervised visits for mother in July and October 2014,

18

where mother failed to show for the necessary orientations. The social worker additionally stated that he and mother discussed switching therapists because Dr. Goodlow was so difficult to reach, but mother "really liked" Dr. Goodlow and no change was made. The social worker acknowledged that mother had given him a new address in San Francisco in early October. She had also provided a telephone number in Las Vegas, stating that she would be working there as well. He did not make any new referrals for mother based on her reported change in residence; nor did she ask him for any.

In addition, the social worker discussed mother's medication compliance, characterizing it as a constant concern. He stated, for example, that mother reported taking methadone on and off, but he could never get an understanding of who prescribed it or how much was prescribed for how long. In his opinion, in order to appropriately parent the minors, mother would need to "get a good sense of her mental health status and the meds that she needs and really show a significant time period where she's able to process some of the Agency's concerns about her ability to be a parent for these children and their needs."

At the end of the social worker's testimony, mother's attorney asked to continue the matter so that mother could be available to testify. Both Agency counsel and counsel for the minors objected, citing lack of good cause. The court denied the continuance request, indicating that the hearing had been set for some time and that mother had the choice to leave her dog outside and be present, but chose instead to leave. After an extended discussion of the relevant timelines in this matter, mother's attorney argued that the Agency failed to provide mother with reasonable services. The juvenile court continued the case to December 18, 2014, for decision.

On December 18, the juvenile court concluded that reasonable services had been provided to mother. However, it found that mother had not made any substantive progress in her court-ordered treatment programs and did not have a "clean, healthy, stable, and safe home" in which to maintain the children. In particular, noting the instability in mother's medication situation, the fact that she had been involuntarily

19

detained in September pursuant to section 5150, and a "marked change in her overall demeanor and appearance" in the courtroom, the juvenile court found mother to be currently mentally unstable. It did not see a substantial probability that further services would lead to a return of the minors to mother within statutory timeframes. It therefore terminated mother's reunification services and referred both children for permanency planning pursuant to section 366.26. Mother subsequently filed a timely notice of her intent to file a writ petition, and the petition itself was filed on February 5, 2015. (Rules 8.450(e), 8.452.)

## II. DISCUSSION

A.     *Adequacy of Jurisdictional Finding*

We begin by dismissing mother's contention that the allegations set forth in the dependency petition filed in this matter fail to support a finding under subdivision (b) of section 300 with respect to her conduct.[6] As chronicled above, the petition alleged that the minors were at risk of harm due to the filthy and hazardous conditions in the family home; mother's mental health issues and history of medication noncompliance; mother's past history of substance abuse; the unavailability of the minors' fathers; the substantiated sexual abuse of C.C. by Joshua C.; and mother's failure to make herself and her home available to the Agency. As to her conduct, mother argues: (1) that she was aware that the house was unsanitary and was planning to move; (2) that there was no nexus between the conditions in the home and any harm to the minors; (3) that she was the nonoffending parent with respect to the sexual abuse and was reported to be protective and appropriate

---

[6] Pursuant to subdivision (b)(1) of section 300, a child falls within the dependency jurisdiction of the juvenile court if: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

20

with the minors in response to that abuse; (4) that harm may not be presumed from the mere fact of mental illness; (5) that the allegations of past substance abuse were stale and did not support a finding of potential harm to the minors; and (6) that there was no nexus between mother's failure to make herself available to the Agency and any harm to the minors. Given these circumstances, mother contends that—as to her— the petition did not support a jurisdictional finding pursuant to section 300, subdivision (b).

As previously stated, mother was neither present nor represented by counsel at the jurisdiction hearing and therefore did not object to the sufficiency of the allegations involving her in the juvenile court. The parties disagree as to whether mother's challenge to the sufficiency of the petition should therefore be deemed forfeited. (See, e.g., *In re David H.* (2008) 165 Cal.App.4th 1626, 1636-1640 (*David H.*) [noting split in authority, but concluding that a challenge to the facial sufficiency of a petition is subject to forfeiture].) We decline to reach this issue, however, because we determine that mother's contentions fail for a more fundamental reason: Under the facts of this case, she has not presented a justiciable controversy.

"It is a fundamental principle of appellate practice that an appeal will not be entertained unless it presents a justiciable issue." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1489 (*I.A.*).) Pursuant to this doctrine of justiciability, " ' "[a] judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition. . . . [A]s a general rule it is not within the function of the court to act upon or decide a moot question or speculative, theoretical or abstract question or proposition, or a purely academic question, or to give an advisory opinion on such a question or proposition. . . ." ' [Citation.] An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*Id.* at p. 1490.) In sum, if mother cannot advance "a present, concrete, and genuine dispute as to which the court can grant effective relief," her argument is not a valid subject for appellate review. (*Id.* at p. 1489.)

In this regard, we note that, in dependency proceedings, jurisdiction is taken over children, not parents. (*I.A.*, *supra*, 201 Cal.App.4th at p. 1491; see *In re Joshua G.* (2005) 129 Cal.App.4th 189, 202-203.) Thus, "a jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence."]) In the present case, jurisdiction was appropriately established over C.H. and S.H. based on the allegation that their father sexually abused their half-sibling, C.C. Because mother does not challenge the jurisdictional findings involving Joshua C.'s sexual abuse, any decision that we might render regarding the allegations involving her would not result in a reversal of the juvenile court's jurisdictional order. Thus, it appears that mother has not presented us with a justiciable controversy.

In fact, mother concedes that, even if the allegations related to her conduct were stricken in this case, the petition would still establish jurisdiction over C.H. and S.H. based on the sexual misconduct of Joshua C. Nevertheless, she asks us to exercise our discretion to review the matter, arguing that " 'the outcome of the appeal could be "the difference between [her] being an 'offending' parent versus a 'non-offending' parent," a finding that could result in far-reaching consequences with respect to these and future dependency proceedings.' " (See *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613 (*Quentin H.*).) It is true that several courts have used this argument as a justification for reaching the merits of a jurisdictional challenge that would otherwise not be deemed justiciable. (See, e.g., *Id.* at p. 613; *In re D.P.* (2014) 225 Cal.App.4th 898, 902; *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-769.) Division One in the First District, in

contrast, refused to apply this rationale where the parent failed to suggest "a single specific legal or practical consequence" from the jurisdictional finding, "either within or outside the dependency proceedings." (*I.A.*, *supra*, 201 Cal.App.4th at pp. 1493-1495.)

Here, mother posits that the jurisdictional findings were prejudicial to her because the sustained allegations formed the basis for her reunification plan, against which her progress would be measured. In addition, she correctly observes that failure to comply with the components of her reunification plan could lead to the continued removal of the minors from her care and, ultimately, to termination of her parental rights. "[A] reunification plan ' "must be appropriate for each family and be based on the unique facts relating to that family." ' " (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 172 (*Basilio T.*).) It is true that subdivision (d) of section 362 provides that "[t]he program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." However, that same section grants the juvenile court broad discretion to "direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper . . . ." (§ 362, subd. (d).) And, importantly, "the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citation.] Instead, the court may consider the evidence as a whole." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*).) "In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order."[7] (*Id.* at p. 311.) Thus, whether the petition allegations

---

[7] Mother's argument to the contrary—that a reunification plan must be based on a problem which caused the court to assume jurisdiction over the child—is incorrect and based on a misreading of *Basilio T.* In that case, the court held that it was error to include a substance abuse component in a reunification plan where there was *no evidence* of substance abuse. (*Basilio T.*, *supra*, 4 Cal.App.4th at pp. 172-173.) Indeed, citing section 366.21, subd. (e), the court expressly recognized that, if such evidence arose later in the dependency, inclusion of a substance abuse component in the reunification plan would be proper even though a substance abuse allegation was not contained in the petition. (*Id.* at pp. 161, 173, fn. 9.)

involving mother were insufficient in and of themselves to support a finding under section 300, subdivision (b) is simply irrelevant under the circumstances of this case, as the juvenile court was free to consider any available evidence regarding mother's situation and its impact on the minors when developing her reunification plan, whether or not that evidence was contained in the petition.

Further, since mother does not contest the juvenile court's assumption of jurisdiction in this case, it appears that her quarrel is really with the court's dispositional order removing the minors from her care. We consider mother's challenge with respect to this dispositional order elsewhere in this opinion. For our purposes here, we note only that in dependency proceedings "the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home." (*Basilio T.*, *supra*, 4 Cal.App.4th at p. 169.) Specifically, a jurisdictional finding need only be made by a preponderance of the evidence. (*Ibid.*) In contrast, a dependent child cannot be removed from the home of a parent at disposition unless the juvenile court finds by *clear and convincing evidence* that, inter alia, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home," and there are no reasonable alternative means to protect the minor. (§ 361, subd. (c)(1); rule 5.695(d)(1); see *In re H.E.* (2008) 169 Cal.App.4th 710, 718-723 (*H.E.*).) Thus, since the juvenile court's jurisdictional findings in this case were insufficient to support the later removal order,[8] the question whether these jurisdictional findings and the allegations in the petition pertaining to mother were, in themselves, sufficient to support a finding under section 300, subdivision (b), was irrelevant to the court's dispositional order which was based on a review of all relevant evidence. (§ 358, subd. (b); *Briana V.*, *supra*, 236

---

[8] Of course, the jurisdictional facts do provide some evidence supporting the court's dispositional order. Mother, however—with one minor exception that was acknowledged by the Agency prior to disposition—has never argued that the jurisdictional allegations are untrue. Rather, her focus has been and continues to be on the sufficiency and import of those allegations under the juvenile court law.

Cal.App.4th at p. 311.) Under these circumstances, we decline mother's invitation to decide the abstract legal proposition that she has presented for our consideration.

### B. *Notice Issues*

Mother next urges us to conclude that her statutory and due process rights to notice were violated because she received defective notice of the detention and jurisdiction hearings in this matter. Until parental rights have been terminated, the dependency statutes require that both parents be given notice at each step in the proceedings. (§ 302, subd. (b); see *David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1019 (*David B.*).) Indeed, at each dependency hearing, the juvenile court is required to "determine whether notice has been given as required by law and must make an appropriate finding noted in the minutes." (Rule 5.534(l).) In addition to these statutory notice requirements, due process demands that a parent be afforded with adequate notice and an opportunity to be heard before being deprived of the companionship, care, custody, and management of his or her child, (*In re B.G.* (1974) 11 Cal.3d 679, 688-689.) Since adequate notice provides "vitally important procedural protections that are essential to ensure the fairness of dependency proceedings," a defect in notice "is a most serious issue, potentially jeopardizing the integrity of the entire judicial process." (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 747, 754 (*Wilford J.*).) On the other hand, " '[i]t is not always possible to litigate a dependency case with all parties present. The law recognizes this and requires only reasonable efforts to search for and notice missing parents. Where reasonable efforts have been made, a dependency case properly proceeds.' " (*In re J.H.* (2007) 158 Cal.App.4th 174, 182 (*J.H.*).)

We have detailed with some specificity the circumstances surrounding the filing of the petition in this case and will not recount them here. It suffices to say that the clear import of the record in this matter is that mother was actively attempting to avoid San Joaquin's intervention by evading contact with the social worker and refusing access by that worker to either her home or her children. Mother's statements regarding moving were equivocal at best and her last comment about moving that is contained in the record is a June 8, 2013, message to the social worker stating that she still had not moved and

25

did not know when she would move. On June 6, 2013, the social worker left mother a voicemail explaining that mother needed to provide her new address if she was moving. On June 11, 2013, the social worker left an additional message for mother, informing her that the matter was being referred to the juvenile court and that mother would be called with the date, time, and location of the detention hearing. Mother did not respond.

Thereafter, mother received actual notice of the initial June 17, 2013 detention hearing date by telephone, and notice of the June 17 hearing, along with a copy of the petition, were left on the front door of the Kelley Drive residence on June 17. Mother also received actual notice via text message of the June 20 continued detention hearing date and declined to attend, even though she was told she must be present and that San Joaquin would arrange transportation. The record discloses no further contact with mother between the June 20, 2013, detention hearing and the July 23, 2013, jurisdictional hearing. However, mother was served with notice of the July 23 hearing by first class mail on July 8. This notice was sent both to the Kelley Drive residence and to Joshua C.'s residence in San Francisco. In addition, an absent parent search was conducted which concluded that mother's last known address was still Kelley Drive.

Mother argues that San Joaquin's attempts to notice her for the detention hearing were defective under section 290.2, subdivision (c), which requires 10-day notice by first class mail followed by personal service if the parent fails to appear. She further contends that the absent parent search conducted prior to jurisdiction was inadequate because San Joaquin knew that mother was no longer living at Kelley Drive and failed to contact her sister in an attempt to obtain her current location. In addition, Joshua C., who appeared at the July 23 hearing, stated that he heard mother was "like in San Francisco, maybe in the Hayes Street or downtown." Yet the court accepted service on mother at Kelley Drive and went forward with the jurisdictional hearing.

We do not accept all of mother's factual conclusions as to what San Joaquin knew or didn't know about mother's whereabouts during this timeframe. Moreover, we seriously doubt that due process was offended by the juvenile court's decision to proceed with the detention hearing after mother received actual notice of that hearing and

26

declined to participate. And, when mother—aware of the proceedings involving her children—failed to provide forwarding information to the social worker and, in fact, arguably absconded with her children in an attempt to avoid involvement with the juvenile court, it is not clear what further obligations San Joaquin had to search for her. Ultimately, however, we need not decide whether any statutory or due process notice violations occurred in this case because we conclude that, to the extent that any such errors did take place, they were harmless beyond a reasonable doubt. Indeed, where—as here—there have been attempts to serve a parent with adequate notice, any "errors in notice do not automatically require reversal but are subject to the harmless beyond a reasonable doubt standard of prejudice." (*J.H.*, *supra*, 158 Cal.App.4th at p. 183.)

With respect to the detention hearing, the record is clear that mother received actual notice of the proceedings, was told why she needed to be there, was informed that she was required to attend, and was offered transportation. Yet she declined to participate in the hearing. Under such circumstances, it seems exceedingly unlikely that any further noticing on the part of San Joaquin would have changed this outcome. Moreover, findings and orders made at a detention hearing are generally rendered moot by later jurisdictional and dispositional determinations. (See *In re David H.*, *supra*, 165 Cal.App.4th at pp. 1634-1635; *Wilford J., supra,* 131 Cal.App.4th at p. 755, fn. 10; *In re Raymond G.* (1991) 230 Cal.App.3d 964, 967; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2015) § 2.190[1], p. 2–644.) Here, the juvenile court's initial detention order was superseded by the dispositional order on April 14, 2014, which formally removed both C.H. and S.H. from mother's care. Mother was present with counsel during this hearing and vigorously contested removal. Thus, any noticing error with respect to the detention hearing was manifestly harmless.

With respect to the jurisdictional hearing, mother argues that the noticing defects were not harmless because the petition allegations regarding her were facially insufficient, did not allege any risk of harm to the minors, and should have been stricken from the petition. She further claims that her presence and appointment of competent counsel were necessary to ensure that these challenges to the petition were placed before

the juvenile court. Of course, mother's argument here must fail for the same reasons we have previously concluded that her jurisdictional challenges do not present a justiciable controversy. Even if she had been present, represented by competent counsel, and managed to strike all of the allegations pertaining to her from the petition, jurisdiction would still have been established based on the sexual abuse of C.C. by Joshua C. Moreover, the juvenile court would have been free to consider all relevant evidence at disposition (where mother was present and represented by counsel) when determining whether to remove the minors from her care, whether or not the allegations were contained in the petition and/or independently established jurisdiction under section 300, subdivision (b). Since there is no evidence that providing mother with any further notice would have actually changed the outcome at jurisdiction or any subsequent hearing, we find any error in this regard harmless beyond a reasonable doubt.

C. *Sufficiency of Dispositional Removal Order*

As mentioned above, mother also challenges the juvenile court's dispositional order removing S.H. and C.H. from her care. Specifically, she argues that removal of the minors was erroneous because: (1) she was the nonoffending parent with respect to the allegations of sexual abuse; and (2) her mental health status was an insufficient basis for concluding that the minors would be at substantial risk of harm if placed in her physical custody. While we do not necessarily disagree with mother's assessment of her status with respect to the sexual abuse allegations, we need not reach this issue as we conclude that removal was appropriate based on mother's unstable mental health situation.

As stated above, in order to remove a dependent child from a parent's home, there must be clear and convincing evidence of a substantial danger to the child's health, safety, or physical or emotional well-being that cannot be eliminated by reasonable means. (*In re J.C.* (2014) 233 Cal.App.4th 1, 6 (*J.C.*); *H.E.*, *supra*, 169 Cal.App.4th at pp. 718-723.) " 'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of

28

the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) However, "[h]arm to the child cannot be presumed from the mere fact of mental illness of the parent." (*In re Jamie M*. (1982) 134 Cal.App.3d 530, 540.) Rather, "[t]he social worker must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness." (*Id.* at p. 542; see also *id.* at p. 540 [proper basis for ruling includes "specific examples of the manner in which the [parent's] behavior has and will adversely affect the child or jeopardize the child's safety"].)

With respect to a removal finding, "[o]ur review on appeal follows the ordinary rules for substantial evidence, notwithstanding that the finding below had to be made by clear and convincing evidence." (*H.E.*, *supra*, 169 Cal.App.4th at pp. 723-724; *J.C.*, *supra*, 233 Cal.App.4th at p. 6.) "Viewing the evidence in the light most favorable to the finding, and presuming in its support the existence of every fact the trier could reasonably deduce, we ask whether any rational trier of fact could have made the finding by the requisite standard. [Citation.] Mere support for a contrary conclusion is not enough to defeat the finding [citation]; nor is the existence of evidence from which a different trier of fact might find otherwise in an exercise of discretion [citation]." (*H.E.*, *supra*, 169 Cal.App.4th at pp. 724.)

Here, the juvenile court—when concluding that continued removal of the minors was appropriate—indicated that it was "very concerned" with the results of mother's psychological evaluation. That evaluation confirmed that mother was dealing with "current significant emotional difficulties," including a severe level of depression. Moreover, it was the expert opinion of the evaluator that mother "displays severe impairment in her ability to form accurate impressions of herself and others where she misinterprets the actions and intentions of others and perceives events in a distorted manner causing difficulty anticipating the consequences of her actions, faulty judgment, and undermining her adjustment. Her confusion separating reality and fantasy will lead to previse adjustment difficulties and make the demands of everyday living difficult without assistance, and the degree of her impairment may meet the criteria for a

29

psychotic disturbance." Thus, the psychological evaluation disclosed specific ways in which mother's current mental health issues placed the children at risk of harm, including her faulty judgment, inability to appropriately interpret the world around her, and difficulty meeting the demands of everyday living.

Further, the evidence at disposition did not simply reveal that mother had a mental illness; it also showed that she had a history of medication noncompliance and was currently not consistently following the treatment plan that had been recommended for her. Specifically, the juvenile court found that mother was inconsistent both with her individual therapy and with her medication regimen, and substantial evidence supports this conclusion. With respect to individual therapy, the letter submitted by her therapist at the April 7 hearing indicated that mother, while engaged in weekly therapy, had attended only two sessions in February and March 2014. With respect to her medication, mother's own testimony indicated that she was receiving prescriptions from different doctors and deciding for herself on a daily basis how much of the medication to take. In its January 2014 dispositional report, the Agency indicated that mother claimed to be taking " 'a lot' " of her medication recently due to the situation with her children. However, her pill bottle indicated that it had last been refilled in early November and, as of December 23, 2013, she still had two pills remaining. On December 26, 2013, she went to a third clinic and obtained an emergency seven-day supply of Zyprexa. She was told to return within the week, but did not. Finally, she did not bring her prescription bottles to the social worker in January 2014 when asked to do so. Thus, there were ample facts in the record from which to conclude that mother was currently not stable on her medication.

In addition—although there was no evidence that mother's new living situation was unsafe or unsanitary—the juvenile court reasonably concluded that it was mother's mental health issues which had allowed the hazardous conditions to develop in the family home in San Joaquin County and that those issues had not been resolved. As the court stated: "It is this Court's opinion that the mother is not stable at this time, that the mental condition that allowed her home to be in the condition that it was in which caused the

30

Court in San Joaquin County to take jurisdiction of this case still exists." Moreover, at the time San Joaquin intervened, the evidence in this matter showed actual detriment, danger, and neglect in the home as opposed to simple clutter or chronic messiness: garbage and dirty diapers littered the kitchen floor; bottles of pesticide and a knife were lying within reach of the minors; the home was infested with cockroaches, which got in the food, fell from the ceiling, and crawled in C.C.'s ears; the front room was full of stacked boxes; and the kitchen counters were full of old, moldy food. (Cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526-527; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1005-1006.) Further, 10-month old S.H. had been treated for scabies and a staph infection in March 2013 and presented with significant emotional disturbance as he regularly head butted the wall and hit, pinched, and kicked others without apparent trigger. Eight-year-old C.C. was reportedly unable to read or write. And, at the time that the petition was filed, mother had failed to take newborn C.H. to the doctor since their release from the hospital, despite the fact that an appointment had been scheduled for her. Given all of these facts, it was reasonable to conclude that the minors would be at similar risk of harm if returned to mother.

Finally, although the court considered options other than removal—such as monitoring mother's compliance under a family maintenance plan—it ultimately concluded that removal was warranted. As detailed above, significant evidence suggested that, at the time of the dispositional hearing in April 2014, mother's mental health situation had not stabilized. Moreover, although mother was at that time cooperating with the Agency, albeit inconsistently, she had failed to cooperate with San Joaquin at the commencement of the case, absenting herself and the minors for significant periods of time and hindering San Joaquin's ability to ensure that C.H. and S.H. were free from harm. These facts provide ample basis for the juvenile court's implied conclusion that there were no reasonable means to protect the minors short of their continued removal. (§ 361, subd. (c)(1); see *H.E.*, *supra,* 169 Cal.App.4th at pp. 718-723.)

31

For all of these reasons, substantial evidence supports the juvenile court's dispositional order removing C.H. and S.H. from mother.

## D. *Ineffective Assistance Claim*

Mother's next argument—that her dependency counsel was ineffective—is easily dismissed given our previous holdings in this matter. Pursuant to section 317.5, subdivision (a), "[a]ll parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel." (See also *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1662 (*Kristin H.*).) Moreover, there is a constitutional right to effective assistance of counsel in certain juvenile dependency hearings where the termination of parental rights may result. (*Kristin H.*, *supra*, 46 Cal.App.4th at p. 1659; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1705-1707.) To establish an ineffective assistance of counsel claim, the burden is on mother "to establish both that counsel's representation fell below prevailing professional norms and that, in the absence of counsel's failings, a more favorable result was reasonably probable." (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292-293 (*Daisy D.*); *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1479.) In addition, a claim of ineffective assistance of counsel is cognizable on direct appeal (rather than by writ of habeas corpus) only "where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1 (*Dennis H.*).)

Here, mother contends that her retained attorney in Alameda County, Mr. Chong, was ineffective for failing to challenge the jurisdictional findings made in San Joaquin County without proper notice to her and while her whereabouts were unknown. However, we have concluded in this opinion that jurisdiction in this case would have been established irrespective of any challenge to the allegations in the petition involving mother.[9] We have further opined that any errors in noticing mother for the detention and

---

[9] Mother chastises Mr. Chong for arguing at disposition that the jurisdictional findings were insufficient to establish a present risk of harm to the three minors rather than moving to have those findings set aside or voided. This, however, was exactly what any competent attorney should have done. As we have previously stated, jurisdiction over

jurisdictional hearings in this matter were harmless. Thus, these arguments were not likely to have succeeded at trial, and their lack of merit provides a more than satisfactory explanation as to why counsel did not press them in the court below. No attorney is required to raise unmeritorious arguments "simply to 'create a record impregnable to assault for claimed inadequacy of counsel.'" (*In re Angel R.* (2008)163 Cal.App.4th 905, 910.)

Mother also claims that Mr. Chong was ineffective because he failed to file a notice of appeal in a timely manner from C.C.'s dispositional hearing on February 18, 2014. It is clear that Mr. Chong intended to file such a notice of appeal because he filed a combined notice for all three minors on April 25, 2014, after the conclusion of the April 14, 2014, dispositional hearing for C.H. and S.H. While the notice was obviously timely as to C.H. and S.H., it was beyond the 60-day time limit with respect to C.C. (See rule 8.406(a)(1).) We cannot extend this time limit, and our "[a]ppellate jurisdiction to review an appealable order is dependent upon a timely notice of appeal." (*In re Elizabeth G.* (1988) 205 Cal.App.3d 1327, 1331; rule 8.406(c).) Thus, it is clear that, in failing to file a timely notice of appeal with respect to C.C., Mr. Chong's representation of mother fell below prevailing professional norms. (See *Daisy D.*, *supra*, 144 Cal.App.4th at pp. 292-293.) Moreover, there is manifestly no satisfactory explanation for Mr. Chong's failure in this regard. (See *Dennis H.*, *supra*, 88 Cal.App.4th at p. 98, fn. 1.) However, an attorney's representation is deemed ineffective only if, in the absence of counsel's failings, a more favorable result was reasonably probable. (*Daisy D.*, *supra*, 144 Cal.App.4th at pp. 292-293.) As previously indicated, we have rejected mother's challenges to the jurisdictional findings with respect to C.H. and S.H. We have also concluded that the juvenile court's dispositional order removing C.H. and S.H. from mother's care was supported by substantial evidence. Since C.C.'s arguments with

---

these minors was established based on the sexual abuse of C.C. by Joshua C. Thus, mother's only available argument was a dispositional one—that the evidence in the record was insufficient to justify removal of the minors from her custody. Mr. Chong argued this vigorously at both dispositional hearings.

respect to jurisdiction and disposition would have been identical to those advanced for the other two minors, even if Mr. Chong had timely filed C.C.'s notice of appeal, it is not reasonably probable that mother would have obtained a more favorable result. Thus, there was no ineffective assistance.

**E.      *Denial of Continuance Under Section 352***

In her writ petition, mother argues that the juvenile court erred in refusing her attorney's request for a continuance of the December 15, 2014, contested review hearing. As stated above, mother arrived at the December 15 hearing with her support dog and—despite the juvenile court's prior order expressly requiring appropriate proof—had no documentation that the dog was a service dog rather than an untrained emotional support animal. The court refused to allow the dog into the courtroom, and, as a result, mother chose not to participate in the hearing. Thereafter, mother's attorney requested a continuance so that mother could be present to testify. Agency counsel objected, arguing that there was not good cause to support the continuance. Minor's counsel also opposed the continuance request, citing the young age of the minors, their need for permanence, and the length of time that the matter had already been continued. In the end, the court denied the motion, stating: "This hearing was set sometime ago. It was set to take place all day and, as we previously discussed on the record, this whole issue with the dog and the choices that the mother had today, she had the choice of leaving the dog outside and being herself here present in the courtroom and she apparently chose to leave. So the Court is not going to continue the matter to another day." Mother contends that the juvenile court's refusal to grant a continuance under these circumstances was an abuse of discretion and a violation of her due process right to be heard.

Continuances in juvenile dependency cases, however, are expressly discouraged and should be difficult to obtain. (*Jeff M. v. Superior* Court (1997) 56 Cal.App.4th 1238, 1242; *In re Emily L.* (1989) 212 Cal.App.3d 734, 743 (*Emily L.*).) Indeed, throughout the dependency statutes, "we find the admonition to accelerate proceedings so that the child is not kept 'in limbo' any longer than necessary." (*Emily L.*, *supra*, 212 Cal.App.3d at p. 743.) Thus, pursuant to section 352, a continuance may be granted only upon a

showing of good cause and only if it is not contrary to the interests of the minor. (§ 352, subd. (a); see rule 5.550(a).) When considering the interests of the minor, a juvenile court must "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).) Ultimately, a juvenile court has discretion to grant or deny a motion for a continuance, and a reversal of that decision is warranted only upon proof that an abuse of discretion occurred. (*Ibid.*; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 605.)

We see no abuse of discretion here. First, the juvenile court had a reasonable basis for distinguishing between service dogs and support dogs when determining which animals would and would not be allowed in the courtroom. As the court expressed it: "So in terms of the record, as far as the Court is concerned about this distinction between service dogs and support dogs, a service dog, as the Court understands it, is a dog that has specific training and has training to deal with whatever the problem may be with its owner, be it psychological, physical, something of that nature. A support dog is a dog that provides psychological support or other types of support for the owner but does not have specific training." The court was understandably concerned about having an untrained dog in the courthouse for an all day hearing. Thus, while perhaps other solutions might have been reached in other courtrooms, the judge's decision in this case was not an irrational one.

Second, Mother was clearly aware that there was an issue with bringing her dog to court and that evidence of the dog's status as a service animal would be required before it would be allowed into the courtroom. When mother was present in court on November 6, 2014, the "[i]ssue re: allowing mother to bring 'comfort' dog to court" was continued. Thereafter, at a hearing on November 19, 2014, the court issued an order expressly prohibiting mother from bringing her comfort dog to court, "unless she could provide the court with acceptable written proof that the dog is a service dog, not just a comfort dog." Any such proof was required to be submitted prior to the next hearing.

35

Although mother was not listed as present at the November 19 hearing, her attorney was present and mother clearly had been in contact with him regarding the matter, as he was ordered to submit proof of the dog's status prior to the next hearing. Mother claimed that she previously had a service dog identification card, but had lost it. As her attorney informed the court: "[My] client and I have discussed it. She's found a number of difficulties trying to obtain the records she needs to get the documentation reissued for her dog. But that was my understanding as well, that the Court wanted to review some records and we have not been able to produce them. My client has no records at the present time. And it was documented, in fact, the Court had asked that I share when I received them with all counsel and the Court and, again, I haven't been able to find anything along the lines of what the Court had asked for and you did make your position very clear."

We are not unsympathetic to mother's reluctance to leave her dog unattended outside of the courthouse. However, the situation was one of her own making. She knew in advance that bringing the dog to court without the appropriate paperwork would be problematic. She could easily have left the dog at home or brought a third party to monitor the dog while she was inside the courthouse for this very important hearing regarding the welfare of her two youngest children. Her decision to do neither did not constitute good cause for a continuance. And "[w]hen a parent is absent without good cause at a properly noticed hearing, the court is entitled to proceed in the parent's absence." (*In re Vanessa M.* (2006) 138 Cal.App.4th 1121, 1131.)

Finally, and equally fatal to mother's position, she made no argument in the juvenile court that a continuance would advance the interests of C.H. and S.H. On appeal, she claims that the children would have benefitted from continuing the matter so that she could testify because—when making difficult decisions—a juvenile court can only be helped by having all relevant information before it. While mother's input would, of course, have been preferable, we see no abuse of discretion in declining to continue the matter further. The young age of the minors, the length of time that they had already been in out-of-home care, the fact that they were on their third placement, mother's past

inconsistency in attending court hearings, her current observed decline in mental functioning, the multiple prior continuances in the case, and the relatively low probability that mother would supply crucial additional evidence of which her attorney was unaware if available and allowed to testify all support the juvenile court's implied conclusion that further continuance of this matter would not have been in the best interests of the children.[10]

## F.     *Reasonable Services*

As a final matter, mother argues that the juvenile court erred in terminating her reunification services because reasonable services were not provided to her by the Agency.  (See, e.g., § 366.21, subd. (e) [the court "shall continue" a case to a 12-month permanency hearing if the court finds at the six-month hearing that reasonable services have not been provided]; *id*., subds. (f) & (g)(1) [continuance of case from 12-month to 18-month hearing where reasonable services have not been provided].)  Specifically, mother claims that her reunification services were unreasonable because: (1) the Agency did not offer her transportation or other assistance to help her get to her appointments on time; (2) the Agency did not provide her with housing assistance after she lost her housing in September 2014; (3) the Agency failed to meet mother at her cognitive level and/or refer her to a therapist appropriate for someone with her level of functioning; (4) the Agency failed to make a referral to a dual diagnosis program; and (5) no visitation occurred with C.H. and S.H. from mid-September through mid-December, 2014.

The adequacy of a reunification plan and the reasonableness of the reunification efforts made by a child welfare agency must be judged according to the circumstances of each case.  (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)  Further, "[i]n almost all cases it will be true that more services could have been provided more

---

[10] We are similarly unconvinced by mother's additional assertion—that the minors would not have been prejudiced by a continuance because they were placed with their paternal grandmother who wished to provide them with a permanent home should reunification fail.  The possibility of future permanence is, by definition, impermanent.  These minors had already been moved once from a stable relative placement due to the erratic behavior of their mother.

frequently and that the services provided were imperfect." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*); see *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)  Thus, when considering the adequacy of reunification services, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako R., supra*, 2 Cal.App.4th at p. 547; see *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425-1426.)

In particular, to support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review a reasonable services finding for substantial evidence.  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)  And, under the present facts, we have no difficulty concluding that substantial evidence supports the juvenile court's finding that the services offered or provided to mother were reasonable.

At disposition, the Agency appropriately identified the problems which led to mother's loss of custody as her mental health issues and possible substance abuse.  The reunification plan adopted for mother contained numerous services designed to remedy these problems, including: individual therapy; drug testing; psychotropic medication evaluation and monitoring; participation in a psychological evaluation, including follow through with all treatment recommendations; and supervised visitation.  The psychological evaluation completed by mother supported the need for each of these identified services and also suggested parenting education.  The Agency made the necessary referrals for all of the recommended services and maintained reasonable contact with mother.  In addition, after mother's situation began to deteriorate and she tested positive for methamphetamines on two occasions, the Agency suggested that

mother participate in a dual diagnosis program. A referral to a program was never made, however, because the court terminated mother's reunification services. Under these circumstances, mother's failure to make meaningful progress towards reunification had, in our view, little to do with the services provided by the Agency and everything to do with mother's own refusal to acknowledge and consistently treat her significant mental health issues.

Moreover, although the Agency did not provide mother with specific transportation or other assistance to get to all of her appointments on time, mother never asked for any help with transportation. And, indeed, she was able to complete many tasks— such as parenting classes, her psychological evaluation, and some drug testing— without any assistance.[11] With respect to housing, again, there is no evidence in the record that mother needed or requested housing support. Finally, mother speculates that the Agency did not take into account her cognitive limitations or refer her to a therapist who understood her limited level of functioning. Once more, there is no evidence of this in the record. To the contrary, the social worker was presumably aware of the contents of the psychological evaluation which discussed mother's cognitive challenges. Moreover, Dr. Goodlow indicated that mother was making "marked progress" in therapy, and mother indicated that she "really liked" her therapist. Thus, there was no evidence the referral to Dr. Goodlow was improper. We conclude with the oft repeated admonition that—with respect to each of these purported reunification deficiencies—if mother felt during the reunification period that the services offered to her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

Mother's lack of visitation with the minors from mid-September through mid-December, 2014, however, is more troublesome. We agree with mother that visitation is an essential component of any reunification plan. (See *In re Mark L.* (2001) 94 Cal.App.4th 573, 580.) However, visitation must be "consistent with the well-being of

---

[11] The record does disclose instances where she was reminded of her appointments by the social worker or service providers.

the child," and "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subds. (a)(1)(A) & (B).)

At the beginning of the reunification period in this case, mother was in the enviable position of residing in the same apartment complex with C.H. and S.H. She was therefore able to engage in supervised visitation with the minors each morning and evening. In July 2014, however, mother had an altercation with one of the minors' relative caregivers and reported to another caregiver that if she " 'had a gun she would kill the kids and this whole situation would go away.' " The social worker attempted to move the supervised visitation to a more neutral setting at that time, but mother failed to attend the required orientation. Then, on September 11, 2014, the minors were removed from their relative placement due to the erratic behavior of mother and placed with another relative in a different county. In connection with this placement change, mother made death threats against the social worker. Another orientation for supervised visitation was scheduled for mother on September 30, 2014, but mother again failed to attend.

At the time of the contested review hearing on December 15, 2014, mother was on a waiting list for therapeutic visitation. The social worker thought that, at that point, the minors needed the support provided by therapeutic visitation services. The social worker had also called San Francisco's child welfare agency in an attempt to uncover additional local visitation resources, but had not received any assistance. Thus, no visitation had occurred since the minor's placement change in mid-September.

Under these circumstances, we find the lack of visitation unfortunate, but understandable. It was mother's own actions which led to the placement change. Moreover, third-party supervised visitation was made available to her twice and she failed to attend the necessary orientations. Mother argues that the Agency should have, itself, supervised the visits. However, given mother's threats of extreme violence against both the social worker and her children, use of a neutral and professional third-party visitation service appears to have been a reasonable means of attempting to ensure the

40

safety of these young children.  Thus, despite the interruption in mother's visitation, we find that the services offered to her were reasonable.

### III. DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders with respect to S.H. and C.H. are affirmed as is the juvenile court's order terminating C.C.'s dependency action.  In addition, mother's writ petition is denied on the merits.  (See § 366.26, subd. (l)(1)(C), (4)(B).)  The stay of the Welfare and Institutions Code section 366.26 hearing previously granted by this court on March 4, 2015, is lifted upon the finality of this opinion.

_____
REARDON, ACTING P. J.

We concur:

_____
RIVERA, J.

_____
STREETER, J.